## HENNINGTON v. THE STATE.

The provision of section 4578 of the code, making it a misdemeanor to run a freight-train upon any railroad in this State on the Sabbath day, is a regulation of internal police and not a regulation of commerce. It is not in conflict with the constitution of the United States, even as to freight-trains passing through the State from and to adjacent States, and laden exclusively with goods and freight received on board before the trains entered this State, and consigned to points beyond its limits. State v. Railroad Co., 24 W. Va. 783, approved; and the majority opinion in Norfolk & W. R. Co. v. Commonwealth (Va.), 13 S. E. Rep. 340, disapproved.

June 8, 1892.

Criminal law. Sunday freight-train. Police. Interstate commerce. Before Judge MILNER. Dade superior court. September term, 1891.

Indictment for running a freight-train on Sunday. The defendant was convicted; and the question made by his exceptions is, whether under the facts the statute (Code, §4578) upon which the indictment is founded, is repugnant to article 1, section 8, of the constitution of the United States. The train was run from Chattanooga, Tenn., to Meridian, Miss., over the railroad of the Alabama Great Southern Railroad Co., a common carrier, in the States of Tennessee, Georgia, Alabama and Mississippi. It was loaded in Tennessee with freight for points beyond the limits of Georgia.

W. U. & J. P. JACOWAY and R. J. & J. McCAMY, for plaintiff in error.

A. W. FITE, solicitor-general, contra.

BLECKLEY, Chief Justice.

If the sanction of time can ever be invoked to justify the exercise of governmental authority over a particular subject-matter, this can certainly be done in respect to setting aside one day in each week for rest and the cessation of all unnecessary labor. A law to this effect

prevailed in the earliest times of which we have any authentic record, and the subject was one of statutory regulation in Georgia during her colonial period, and has so continued throughout the whole term of her existence as a State. At no instant since her independence was declared has she been without such a law on her statute book. It is not only unlawful, but penal, for any person whatsoever to "pursue their business or work of their ordinary calling upon the Lord's day, works of necessity or charity only excepted." Code, §4579. This prohibition upon Sunday labor was already in force when the code was adopted, and dates back to the year 1762. The penalty prescribed by the colonial statute has been changed, but in other respects that statute has been operative continuously since it was enacted. There can be no well founded doubt of its being a police regulation, considering it merely as ordaining the cessation of ordinary labor and business during one day in every week; for the frequent and total suspension of the toils, cares and strain of mind or muscle incident to pursuing an occupation or common employment, is beneficial to every individual, and incidentally to the community at large, the general public. Leisure is no less essential than labor to the well-being of man. Short intervals of leisure at stated periods reduce wear and tear, promote health, favor cleanliness, encourage social intercourse, afford opportunity for introspection and retrospection, and tend in a high degree to expand the thoughts and sympathies of people, enlarge their information, and elevate their morals. They learn how to be, and come to realize that being is quite as important as doing. Without frequent leisure, the process of forming character could only be begun; it could never advance or be completed; people would be mere machines of labor or business—nothing more.

If a law which, in essential respects, betters for all

the people the conditions, sanitary, social and individual, under which their daily life is carried on, and which contributes to insure for each, even against his own will, his minimum allowance of leisure, cannot be rightly classed as a police regulation, it would be difficult to imagine any law that could.  With respect to the selection of the particular day in each week which has been set apart by our statute as the rest day of the people, religious views and feelings may have had a controlling influence.  We doubt not they did have; and it is probable that the same views and feelings had a very powerful influence in dictating the policy of setting apart any day whatever as a day of enforced rest.  But neither of these considerations is destructive of the police nature and character of the statute.  If good and sufficient police reasons underlie it, and substantial police purposes are involved in its provisions, these reasons and purposes constitute its civil and legal justification, whether they were or not the direct and immediate motives which induced its passage, and have for so long a time kept it in force.  Courts are not concerned with the mere beliefs and sentiments of legislators, or with the motives which influence them in enacting laws which are within legislative competency.  That which is properly made a civil duty by statute is none the less so because it is also a real or supposed religious obligation; nor is the statute vitiated, or in any wise weakened, by the chance, or even the certainty, that in passing it the legislative mind was swayed by the religious rather than by the civil aspect of the measure.  Doubtless it is a religious duty to pay debts, but no one supposes that this is any obstacle to its being exacted as a civil duty. With few exceptions, the same may be said of the whole catalogue of duties specified in the ten commandments. Those of them which are purely and exclusively religious in their nature, cannot be or be made civil duties,

but all the rest of them may be, in so far as they involve conduct as distinguished from mere operations of mind or states of the affections. Opinions may differ, and they really do differ, as to whether abstaining from labor on Sunday is a religious duty; but whether it is or not, it is certain that the legislature of Georgia has prescribed it as a civil duty. The statute can fairly and rationally be treated as a legitimate police regulation, and thus treated, it is a valid law. There is a wide difference between keeping a day holy as a religious observance, and merely forbearing to labor on that day in one's ordinary vocation or business pursuit.

Nor is the statute a regulation of commerce. It applies alike to all business, vocations and occupations. It concerns the general police of the State and of all interests, whether agricultural, mechanical, manufacturing, commercial, professional, or what not. It is universal, and rigidly impartial, making no discrimination whatever for or against commerce or anything else. It puts no obstacle in the way of trade or its operations which is not encountered by every other class of worldly business or employment. Non-trading days are non-business days generally, and non-working days for all the people. Trade may go on when anything else can; it stops only when, and so long as, there is a complete suspension of worldly enterprise and activity. It is required to take no rest which is not appointed for everything else to take.

Having now classified the colonial act of 1762, as brought down to us in section 4579 of the code, it is easy to see that the later legislation embraced in section 4578 of the code, belongs to identically the same class, and seeks only to enforce and render effective, as respects the running of freight-trains on Sunday, the scheme of internal police which the former established as universal throughout the State for all industries and

avocations. On the assumption that the running of such trains on Sunday, under ordinary circumstances, is not a work of necessity, the running of them on that day was already prohibited by virtue of the prior statute when the later one was passed. The new legislation silently assumes that the running of these trains on Sunday is not a work of necessity; and in express terms it renders the superintendent, or other officer having control of the running of trains, answerable penally for any running which may be done on that day. As the person having the right and power to prevent it, he is held responsible for its occurrence whenever it does occur, save when it it done by others in violation of his own orders and rules. The language of the statute, so far as now material, is as follows: " If any freight-train shall be run on any railroad in this State on the Sabbath day (known as. Sunday), the superintendent of transportation of such railroad company, or the officer having charge of the business of that department of the railroad, shall be liable for indictment for a misdemeanor in each county through which such train shall pass. . . . The defendant may justify himself by proof that such employees acted in direct violation of the orders and rules of the defendant." Code, §4578. The section of the code just cited embraces qualifying provisions added by acts of 1873, p. 63, and acts of 1874, p. 97. A still further qualification may be found in acts of 1882, p. 66. None of these qualifications are directly pertinent to the present inquiry.

We hold confidently, and without doubt, that section 4578 is no more a regulation of commerce than is section 4579; that both are to be taken and construed together; and that the former is part and parcel of the police system generalized in the latter, but first drawn out in one of its details by the former and applied to the specific work or business mentioned, in so far, and in so

far only, as superintendents or train managers are concerned. In so far as employees engaged immediately in running freight-trains on Sunday are concerned, section 4578 has no direct application. They are still left to be dealt with under the other section.

It is almost superfluous to add that we deem it of no consequence that in the case now under consideration, the freight-train run on Sunday was merely passing through and over some of the territory of this State on its journey from the State of Tennessee into the State of Alabama, and was laden exclusively with goods and freight received on board before it entered this State, and consigned to points in Alabama or beyond. It is no valid objection to a police regulation that it may incidentally affect interstate commerce, or persons engaged therein. Almost any broad and comprehensive police regulation may have such a consequence in a greater or less degree. Nothing can be legitimate police which would prohibit, unduly restrict, or unreasonably delay interstate commerce; but to call a weekly halt to all business of every kind throughout the length and breadth of the State, is to treat interstate commerce as everything else is treated; and surely what is exacted by law to be done, and has been generally done in Georgia for more than one hundred years, is not, in itself, unreasonable. The right of every State to enact a similar law, and the possible chance that one State may select one day of the week for rest, another State another day, and so on until a wide reach of interstate commerce would find itself unable to move at all, cannot fairly be urged in condemnation of the police system prevailing at present in Georgia. Every system is reasonable or not according to conditions. When conditions change, it is time enough to change the system; and it may well be assumed that any necessary change will be made in due time. So far as appears, and so far as we are aware,

v 90-26

no day of the week except Sunday is anywhere in the United States a day of enforced rest. We are not now practically concerned with what is possible if other days should, in some of the States, be preferred to Sunday. Whether, in that event, Georgia must change or they must, or no day whatever be protected, need not be anticipated. It is enough that, under present conditions, interstate commerce is subjected to no unreasonable delay by the Sunday law now in force.

We have examined the case of State *v.* Railroad Company, 24 W. Va. 783, and that of Norfolk & W. R. Co. *v.* Commonwealth (Va.), 13 S. E. Rep. 340. We agree with the former, and disagree with the majority opinion in the latter.        *Judgment affirmed.*